UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THEODORE G. WILLIAMS

      Petitioner,

                                  CASE NO. 93-CV-75495-DT
v.                              JUDGE PAUL D. BORMAN
                                  MAGISTRATE JUDGE PAUL KOMIVES

WILLIAM MEYER

      Respondent.

_____/

**REPORT AND RECOMMENDATION ON PETITIONER'S OBJECTIONS**

*Table of Contents*

I.      RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     A.     *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
     B.     *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
           1.     *Due Process* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
                 a. Likelihood of Dangerousness under the Statute . . . . . . . . . . . . . . . . . . . . . . . . . . 5
                 b. Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
                 c. Kansas v. Crane . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
           2.     *Equal Protection* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     C.     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

\*      \*      \*      \*      \*

I.      RECOMMENDATION: The Court should overrule petitioner's objection to my prior Report

and Recommendation, and should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.     *Background*

        This matter is before the Court on remand from the United States Court of Appeals for the

Sixth Circuit. The factual background is set forth in detail in my initial Report and Recommendation

filed on March 7, 2001, and is only briefly recounted here.

Petitioner Theodore G. Williams is detained at the Center for Forensic Psychiatry, under the jurisdiction of the Michigan Department of Mental Health (DMH).  Petitioner's current confinement arises from his January 17, 1968, guilty plea to first degree murder.  He is confined pursuant to Michigan's now-repealed Criminal Sexual Psychopath Act ("CSPA"), MICH. COMP. LAWS ANN. § 780.501-.509 (West 1968), *repealed by* 1968 Mich. Pub. Acts 143 (Aug. 1, 1968), and pursuant to an administrative order of the Michigan Supreme Court continuing the release provisions of the CSPA for persons confined under the Act prior to its repeal, *see* Admin. Order 1969-4, 382 Mich. xxix (1969).  Petitioner appears to be the only person in Michigan still confined pursuant to the CSPA.

Relevant here, petitioner filed a petition for release under § 7 of the CSPA in 1991 in the Allegan County Circuit Court.  Petitioner claimed that his continued incarceration violates his Fourteenth Amendment rights to due process and equal protection of the laws.  The trial court denied petitioner's legal arguments on July 29, 1993.  *See People v. Williams*, No. 67-4411 FY (Allegan County, Mich., Cir. Ct. July 29, 1993).  On August 4, 1993, petitioner filed his *pro se* application for the writ of habeas corpus in this Court.  On January 5, 1995, Judge Barbara Hackett dismissed the petition without prejudice to petitioner seeking to reopen his case once the state court proceedings had concluded.

Meanwhile, the trial court conducted a trial on the merits of the discharge petition in the first half of 1994.  After hearing testimony from four mental health experts and petitioner, the trial court concluded that petitioner was not entitled to release under the CSPA, and that his constitutional challenges were without merit.  The Michigan Court of Appeals affirmed the trial court's decision, concluding that: (1) petitioner's due process challenge was without merit in light of the United

States Supreme Court's decision in *Kansas v. Hendricks*, 521 U.S. 346 (1997), *see People v. Williams*, 228 Mich. App. 546, 552-56, 580 N.W.2d 438, 441-43 (1998); (2) petitioner's equal protection claim was without merit, *see id*. at 556-57, 580 N.W.2d at 443; and (3) the trial court's decision that petitioner was not entitled to release under the CSPA was not clearly erroneous, *see id*. at 557-59, 580 N.W.2d at 443-44. The Michigan Supreme Court denied petitioner's application for leave to appeal. *See People v. Williams*, 459 Mich. 914, 589 N.W.2d 287 (1998).

On January 8, 1999, petitioner filed a motion to reopen his habeas case. Judge Hackett granted the motion and counsel was appointed for petitioner. On March 7, 2000, counsel filed an amended petition presenting the two claims raised in the Michigan courts, *i.e.*, that petitioner's continued confinement under the CSPA violates his due process and equal protection rights under the Fourteenth Amendment. Respondent filed an answer to the amended petition on January 8, 2001.

On March 7, 2001, I filed a Report recommending that the Court deny petitioner's application for the writ of habeas corpus. On March 16, 2001, petitioner filed a motion to extend the time in which to file objections, which was consented to by respondent. The Court granted the motion and extended petitioner's time to file objections to April 25, 2001. On April 24, petitioner filed a second motion for enlargement of time. The Court denied the motion on April 27, 2001, and entered an order accepting my Report and Recommendation on the same date. On May 11, 2001, petitioner moved for relief from judgment pursuant to FED. R. CIV. P. 60(b), seeking reconsideration of the Court's April 27, 2001, order denying his request for an extension of time in which to file objections. The Court denied that motion on June 6, 2001.

On July 3, 2001, petitioner filed a notice of appeal in the Sixth Circuit. On January 11, 2002,

pursuant to 28 U.S.C. § 2253, the Sixth Circuit granted a certificate of appealability limited to the issue of whether the Court properly denied petitioner's motion for relief from judgment and for leave to file objections to my Report and Recommendation.  On September 25, 2003, the Sixth Circuit issued its decision reversing the Court's denial of petitioner's motion for an enlargement of time, vacated the Order adopting the Report and Recommendation and the Court's judgment, and remanded the case "with instructions for the district court to accept Williams' objections for filing, and to issue a decision on Williams' petition after consideration of all his objections."  *Williams v. Meyer*, 346 F.3d 607, 617 (6th Cir. 2003).  On January 26, 2004, the Court referred the matter to me for a Report and Recommendation re-examining the petition in light of the Sixth Circuit's decision as well as petitioner's objections to the initial Report.

On July 20, 2004, I filed a Report recommending that the Court grant petitioner's application for the writ of habeas corpus in light of the Sixth Circuit's opinion remanding the matter to the Court.   I concluded that the Sixth Circuit's opinion, which found petitioner's claims to be "meritorious," compelled this result.  On October 26, 2004, the Court rejected my recommendation. The Court concluded that neither the Sixth Circuit's reasoning nor its conclusion compelled a grant of the writ.  More specifically, the Court explained that a "meritorious" claim under Rule 60(b)–the issue considered by the Sixth Circuit–is not necessarily one which will ultimately prevail.  Rather, a meritorious claim in this context is a claim which is arguable.  Accordingly, the Court rejected my Report and Recommendation, and referred the matter back to me with instructions to hold a hearing on the matter and issue a report addressing petitioner's objections to my original Report and Recommendation.  On January 3, 2005, petitioner filed a supplement to his objections, and a hearing was held on the matter on January 7, 2005.

B.    *Analysis*

1.    *Due Process*

Petitioner first claims that the release provisions of the CSPA violate his right to due process of law under the Supreme Court's decision in *Kansas v. Hendricks*, 521 U.S. 346 (1997). Specifically, in his amended habeas application petitioner contends that the release provisions violate his due process rights because: (1) it does not place the constitutionally required burden of proof on the state; and (2) the statute does not require objective criteria to determine whether he continues to suffer from a mental abnormality or whether he remains a danger to others. Petitioner also contends that even if the statute itself is constitutional, it was unconstitutional as applied to him because the prosecutor did not present clear and convincing evidence that he was likely to engage in future acts of sexual violence. In his objections, petitioner contends that I erred in finding that the CSPA, as interpreted by the Michigan Court of Appeals, obligates the state to prove a likelihood of future dangerousness as required by *Hendricks*. He also challenges my conclusion that there was sufficient evidence presented at the release hearing to establish a likelihood of future dangerousness. The Court should overrule these objections.

a. *Likelihood of Dangerousness under the Statute*

In my initial Report, I recommended that the Court reject petitioner's claim that the CSPA falls short of the *Hendricks* standard requiring proof of a likelihood of future dangerousness. I reasoned:

> Were the Court limited to the text of section 7, petitioner's argument would have some merit. Nothing in the text of that provision sets forth a burden of proof, nor does it place such a burden on the prosecutor, as opposed to the detainee seeking release. This Court is not, however, limited to the text of the statute. As the Supreme Court has made clear, in considering a constitutional challenge to a state law "'a federal court must . . . consider any limiting construction that a state court

5

or enforcement agency has proffered.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates Inc.*, 455 U.S. 489, 494 n.5 (1982)) (alteration in original). Here, the Michigan Court of Appeals explicitly interpreted "the CSPA as properly requiring the state to prove by clear and convincing evidence that continued civil commitment is necessary," and noted that the trial court "has consistently applied this standard to [petitioner]'s many petitions for release under the CSPA." *Williams*, 228 Mich. App. at 555 n.8, 580 N.W.2d at 442 n.8. Thus, the question is whether section 7 as so interpreted satisfies the requirements of due process. The Court should conclude that it does.

R&R, dated 3/7/01, at 15-16. After concluding that the burden of proof in general satisfies

*Hendricks*, I also rejected petitioner's argument that the statute does not require the finding of a

likelihood of future dangerousness as required by *Hendricks*:

> Section 7 does provide, however, that release is appropriate when the detainee "is found to have recovered from such psychopathy to a degree that he will not be a menace to others." MICH. COMP. LAWS § 780.507. While this language certainly differs from the Kansas statute involved in *Hendricks*, the *Hendricks* Court itself noted that it has "never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes." *Hendricks*, 521 U.S. at 359; *see also*, *id*. at 374 (Breyer, J., concurring in part and dissenting in part) (agreeing that states may civilly commit persons suffering from a mental abnormality who are dangerous, and noting that "the Constitution gives States a degree of leeway in making this kind of determination."). As petitioner's case demonstrates, the Michigan courts' application of this provision mirrors the Kansas statute. Specifically, the court of appeals noted that petitioner's claim on this point failed "because the state proved, as required by the CSPA, that [petitioner] would pose *an actual threat of danger* to others if he were release from his detention[.]" *Williams*, 228 Mich. App. at 555, 580 N.W.2d at 442. Thus, the "menace to others" language of section 7 serves the same purpose as the "likelihood of such conduct" language in the Kansas statute, namely, to insure that continued commitment is based on a finding of future dangerousness. Section 7, similar to the Kansas statute, "requires proof of more than a mere predisposition to violence; rather, it requires evidence of past sexually violent behavior and a present mental condition that [makes the detainee a menace to others] if the person is not incapacitated." *Hendricks*, 521 U.S. at 357-58. In other words, the CSPA "plainly requires a finding of dangerousness [and] then 'links that finding' to a currently diagnosed mental disorder characterized by the inability to control dangerous sexual behavior. This formula permissibly circumscribes the class of persons eligible for commitment under the Act." *Hubbart*, 969 P.2d at 597; *see also*, *Heller v. Doe*, 509 U.S. 312, 317-18 (1993) (upholding civil commitment statute requiring a showing that the person is "a danger or threat of danger" to others); *In re P.S.*, 702 A.2d 98, (Vt. 1997) (holding that standard

6

allowing for commitment upon showing that person was "in need of treatment," which in turn required only a showing that the person's mental illness lessened his ability to control his affairs to the extent that he "poses a danger of harm to others" was sufficient under the Due Process clause and noting that "dangerousness is an amorphous concept that is highly dependent on its application. Many states have defined the concept with no more certainty and imminence than our 'patient in need of further treatment' standard, and these definitions have generally been upheld by state and federal courts.").

R&R, dated 3/7/01, at 17-18.

In support of his objection petitioner relies, as did the Sixth Circuit in finding this claim to be meritorious for Rule 60(b) purposes, on a single sentence in the Michigan Court of Appeals's opinion. In concluding that the CSPA satisfies *Hendricks*, the court observed that the statute "requires the state to prove that the subject of the contemplated commitment has a mental disorder, coupled with *criminal propensities* to commit future sex offenses or 'future dangerousness.'" *Williams*, 228 Mich. App. at 554, 580 N.W.2d at 442 (emphasis added). Petitioner argues that this sentence makes it clear that the court did not interpret the CSPA as requiring a finding of a likelihood of future dangerousness. Petitioner's argument, however, reads too much into this single sentence. It is clear from the context that the court was using the word "propensity" as a short hand for the future dangerousness requirement, and not establishing a legal rule that propensity evidence alone is sufficient under the CSPA. This is clear when one considers the entirety of the court of appeals's opinion. First, in discussing petitioner's equal protection claim, the court clearly and unambiguously explained that "the CSPA requires the prosecutor to *prove* both a mental disorder and *future dangerousness to others*." *Williams*, 228 Mich. App. at 557, 580 N.W.2d at 443.

Second, and more importantly, the court of appeals made clear that, regardless of the language of the CSPA or its own limiting construction of the act, the standard *actually applied* in petitioner's case satisfied the future dangerousness requirement of *Hendricks*. Specifically, the court

7

rejected petitioner's claim that the statute is unconstitutional due to the lack of objective criteria "because the state proved, *as required by the CSPA*, that defendant would pose *an actual threat of danger* to others if he were released from his detention[.]" *Williams*, 228 Mich. App. at 555, 580 N.W.2d at 442 (emphasis added). Even if petitioner is correct that the Michigan Court of Appeals's interpretation of the CSPA permits a court to deny release where a likelihood of future dangerousness is not proven, that is not what happened here. In petitioner's case, the court of appeals explicitly found that the state had proved an actual threat of future dangerousness, and that conclusion is supported by the record, as discussed below. Petitioner has cited, and I have found, no case affording habeas relief on the basis of potentially unconstitutional applications of statutes where the actual procedures employed in the petitioner's case were constitutionally valid. Rather, the contrary rule seems to hold. *See Hatch v. Oklahoma*, 58 F.3d 1447, 1469 (10th Cir. 1995) (habeas relief not available for death sentence imposed under aggravating factor which is unconstitutionally vague on its face where the state appellate court subsequently adopts a constitutionally permissible limiting construction and determines that the jury could have sentenced the petitioner to death under that construction); *Gagnon v. Cupp*, 454 F.2d 287, 288 (9th Cir. 1972) (per curiam) (habeas relief not available on claim that statute under which petitioner was convicted was unconstitutionally vague and overbroad where there was "no showing that the overbreadth or vagueness, if any, was applied to [petitioner]."); *Jones v. Painter*, 140 F. Supp. 2d 677, 681-82 (N.D. W. Va. 2001) (habeas relief not available based on facial vagueness of statute of conviction where the petitioner's own conduct was clearly within the conduct prohibited by the statute).

### b. Sufficiency of the Evidence

Petitioner also contends that I erred in concluding that the state had sufficiently proved his

likelihood of future dangerousness to permit his continued commitment.  In rejecting this claim in

my initial Report, I reasoned:

> Petitioner bases this argument primarily on the fact that each of the four psychiatric
> experts based their finding of continued dangerousness, at least in part, on his past
> criminal conduct.  Contrary to petitioner's argument, however, there is nothing
> improper about relying on this conduct.  Because petitioner has been incarcerated in
> an environment which does not allow him the opportunity to reoffend, his prior
> conduct is perhaps the best indication of his future dangerousness.  *See Martin v.
> Reinstein*, 987 P.2d 779, 801 (Ariz. Ct. App. 1999).  Thus, "[n]otwithstanding the
> nuances of psychiatric diagnosis and the difficulties inherent in predicting human
> behavior, the United States Supreme Court has consistently upheld commitment
> schemes authorizing the use of prior dangerous behavior to establish both present
> mental impairment and the likelihood of future harm."  *Hubbart*, 969 P.2d at 600-01
> (citing *Hendricks*, 521 U.S. at 358; *Heller*, 509 U.S. at 323; *Allen v. Illinois*, 478 U.S.
> 364, 371 (1986)); *see also*, *Heller*, 509 U.S. at 323 ("Previous instances of violent
> behavior are an important indicator of future violent tendencies.").
>
> Furthermore, the psychiatric experts did not rely solely on petitioner's past
> conduct in evaluating his future dangerousness.  Dr. Diane Heisel based her
> conclusion on the nature of petitioner's antisocial personality disorder, the nature of
> his previous crimes (*i.e.*, petitioner's indication that the crimes "just happened" for
> no reason he could explain) and his lack of complete candor in his discussions with
> her.  *See* Hr'g Tr., Vol. I, at 15-18, 48-49.  Dr. George Watson testified that
> petitioner was not entirely forthcoming which made it impossible to treat petitioner's
> condition and had engaged in other inappropriate sexual behavior which petitioner
> did not suggest was inappropriate.  *See id*. at 77-84.  Dr. Mark Fettman testified
> similarly, *see id*. at 111-12, as did Dr. William Yaroch, who treated petitioner for a
> couple of years, *see id*. at 129-32.  Thus, while these experts based their opinions in
> large part on petitioner's past behavior, they also considered his current mental
> condition and gauged his future dangerousness in light of both the past behavior and
> the present condition.  This evidence was sufficient to conclude that petitioner
> remains likely to engage in further sexually assaultive conduct if released.  *See State
> v. Woods*, 945 P.2d 918, 923-24 (Mont. 1997); *In re Commitment of Adams*, 588
> N.W.2d 336, 341-42 (Wis. Ct. App. 1998).  Accordingly, the Court should conclude
> that petitioner is not entitled to habeas relief on this claim.

R&R dated 3/7/01, at 19-20.

In his objections, petitioner contends that I erred in this determination.  Specifically, he

contends that the state's evidence showed at most that the experts could not rule out the possibility

that he might be a danger, and that his own evidence showed either that his disorder was in

remission or that he was no longer dangerous.  As explained in my prior Report, there was nothing inappropriate in the psychiatrists' reliance in part on petitioner's prior crimes to establish his continued mental impairment and his likelihood of future dangerousness.  And, contrary to petitioner's argument, this was not the sole basis for the psychiatrists' testimony, nor did they merely opine that they could not rule out the possibility that he might be a danger.  Dr. Heisel indicated that her opinion was based not only on petitioner's prior crime, but also on her interview with petitioner and a review of previous testing and reports.  *See* Hr'g Tr., Vol. I, at 15, 26-27.  She also testified that, although not precisely the same, in her evaluation of petitioner under the CSPA "the issues that we were looking at are not all that different than what we would be looking in a civil commitment," *i.e.*, mental illness and dangerousness.  *See id*. at 23.

Dr. Watson also testified that his opinions were based in part on observation of and discussion with petitioner, and on psychiatric records.  *See id*. at 71-72.  Dr. Watson gave detailed testimony as to why he felt that petitioner had not recovered from his disorder and why he should still be regarded as a risk to reoffend, most notably petitioner's failure to honestly discuss the incidents so that an appropriate treatment plan could be implemented.  *See id*. at 77-87.  Dr. Fettman also based his opinion on information beyond the original crimes, *see id*. at 112, and concluded that not only did petitioner pose a likelihood of future dangerousness, but that "releasing him into society poses an imminent danger to society[.]" *Id*.

It is true that the psychiatrists' testimony indicated that they were unable to conclude that petitioner had not recovered from his mental disorder.  However, this was due to petitioner's own failure to cooperate with the psychiatric professionals.  Dr. Yaroch, for instance, testified that

> the best thing I could say about it is that he has changed a little bit over the years.
> He seems to be more aware of what goes on inside himself, but I don't see any great

10

conviction noted in that kind of patient that is too open, he doesn't – he's never told me very much about what goes on, and when he does talk with me, it's in very – not mechanical, but it give [sic] me the feeling that he has that.

*Id*. at 130.  Dr. Heisel likewise testified that petitioner had been less than honest in his interviews.

*See id*. at 18.  Dr. Watson was more explicit:

> The questions go to Mr. Williams' account to myself and other examiners of his state of mind at the time of the criminal behaviors for which he was adjudicated a criminal sexual psychopath.  In a sense Mr. Williams was not able to give us an account that would enable use to understand what was the motivation for his actions, what were the feelings and fantasies and other attendant inter-reactions that he had during the different acts that he was alleged to have committed, I really find it difficult to explain why he did things that he was found guilty of or adjudicated for have [sic] done.  For that reason, accordingly, it is very difficult now to say – what is difficult to say that similarly, he would not act similarly should a similar opportunity present itself.  So, in other words, in the absence of Mr. Williams being able to explain to us certain warning signs or certain opinions, perceptions, or reaction[s] that he had, seems to result in what he did.  I think it's very difficult for him now to explain to us he is okay now.

*Id*. at 75.  Far from shifting the burden of proof to petitioner, this testimony merely indicates that petitioner's failure to cooperate with the treating and examining psychiatrists, and to give a full account of his thoughts and feelings during the crime, were themselves indicative of a continued mental disorder.  Petitioner has cited to no case holding that it is improper for a psychiatric expert to rely on such an unwillingness or inability to cooperate in concluding that a civil committee continues to suffer from a mental disorder and remains a threat to others.

In short, although petitioner presented conflicting evidence, there was sufficient evidence presented by the state to justify the trial court's conclusion that petitioner continues to suffer from a mental disorder, and that he continues to present a likelihood of future dangerousness if released.  Accordingly, the Court should conclude that petitioner's objections on this basis are meritless.

### c.  Kansas v. Crane

11

Finally, petitioner contends that the Supreme Court's more recent decision in *Kansas v. Crane*, 534 U.S. 407 (2002), calls into question the conclusions of my earlier report. In that case, the Court considered the same Kansas statute that it had considered in *Hendricks*. Interpreting the statute in light of *Hendricks*, the Kansas Supreme Court held in that case that *Hendricks* requires the state to show, prior to commitment, that the person to be committed has a total inability to control his behavior. The Supreme Court rejected this reading of *Hendricks*, "agree[ing] with Kansas insofar as it argues that *Hendricks* set forth no requirement of *total* or *complete* lack of control." *Crane*, 534 U.S. at 411 (emphasis in original). The Court went on, however, to disagree with the state's argument "that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." *Id.* at 412 (emphasis in original). On the contrary, the Court held, the state must provide "proof of serious difficulty in controlling behavior." *Id.* at 413. The Court explained that this lack-of-control showing,

> when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.*

Petitioner argues that, in his case, "the state adduced no proof that he *presently* suffered a serious difficulty in controlling his behavior, or that any such difficulty, if it existed, distinguished him from the 'typical recidivist.'" Supp. to Pet'r's Objections, at 3-4. Even assuming that this argument is properly before the Court,[1] it fails on the merits. While it is true that the Supreme Court

---

[1]Petitioner did not argue in the state courts that his continued commitment violated his constitutional rights because of a lack-of-control determination. Thus, to the extent that this represents a separate argument for relief, the claim is unexhausted.

in *Crane* found that the mere presence of antisocial personality disorder alone would be insufficient to justify civil commitment, *Crane* is nonetheless satisfied where the state presents evidence of a lack of ability to control behavior tied to the antisocial personality disorder. *See Adams v. Bartow*, 330 F.3d 957, 962-63 (7th Cir. 2003); *Linehan v. Milczark*, 315 F.3d 920, 928-29 (8th Cir. 2003). Further, "*Crane* does not require specific findings on the *nature* of the condition responsible for a sexual violent predator's lack of control." *Brock v. Seling*, 390 F.3d 1088, 1090-91 (9th Cir. 2004). Importantly, the Supreme Court in *Crane* "did not conclude that such a finding had to be made separately from the findings of dangerousness and mental illness. Indeed, the Court explicitly rejected the establishment of a bright-line test for inability to control behavior." *United States ex rel. Varner v. Budz*, 361 F. Supp. 2d 762, 766 (N.D. Ill. 2005).

Here, consistent with *Crane*, the Michigan Court of Appeals found such an impairment of petitioner's ability to control his behavior. Indeed, although it did not have the benefit of the Supreme Court's decision in *Crane*, the court of appeals interpreted *Hendricks* in much the same way that the Supreme Court later would in *Crane*. Describing the Court's decision in *Hendricks*, the court of appeals explained that the Kansas statute in that case "passed constitutional muster because it required the state to prove future dangerousness and to further establish the existence of a 'mental abnormality' or 'personality disorder' that *interferes with volitional control and thus makes it difficult or impossible for the sexual predator to resist his criminal sexual impulses.*" *Williams*, 228 Mich. App. at 553, 580 N.W.2d at 441-42 (emphasis added). The court of appeals also held that the state proved that petitioner had a "mental disorder that predisposes him to commit future sex offenses." *Id*. at 555, 580 N.W.2d at 443. A predisposition caused by a mental disorder necessarily implies the existence of a difficulty in controlling behavior related to the mental

13

disorder. *See Adams*, 330 F.3d at 962-63 (state court's finding that committee suffered from antisocial personality disorder and was "substantially probable" to commit another offense satisfied *Crane*'s lack of control requirement.). Accordingly, the Court should conclude that *Crane* does not alter the result recommended in my prior Report.

     2.    *Equal Protection*

     Petitioner also claims that his detention under the CSPA violates his right to the equal protection of the laws. Petitioner argues that he is treated differently from other persons similarly situated to him but who are committed under the Mental Health Code, which was enacted a few years after the repeal of the CSPA. Under the Mental Health Code, a person may be found to have committed a crime, but be acquitted by reason of insanity. The Code also provides for involuntary civil commitment of persons with mental disorders. Under the Mental Health Code, a person (whether found not guilty by reason of insanity or involuntarily committed in a civil commitment proceeding) may be discharged from the mental health facility if *either* the person is no longer mentally ill, or is no longer a danger to himself and others. *See* MICH. COMP. LAWS §§ 330.2050(5), 330.1476-.1479. Further, under the Mental Health Code a person may be confined only if there is a reasonable expectation that he will harm himself or others in the near future. *See* MICH. COMP. LAWS § 330.1401.

     In my initial Report, I recommended that the Court reject this claim for two reasons. First, I reasoned that petitioner

> cannot show that he was treated, in any way constitutionally significant, differently from persons committed under the Mental Health Code. The court of appeals rejected petitioner's equal protection claim on this basis, reasoning that "the release procedures of the CSPA largely mirror the release procedures that the Legislature has extended to other civilly committed persons." *Williams*, 228 Mich. App. at 556, 580 N.W.2d at 443. The court explained that the requirements for release under the

14

Mental Health Code and under the CSPA as interpreted by the court were substantially the same, and thus the different language used in the acts did not provide a basis for petitioner's equal protection challenge. *See id.* at 556-57, 580 N.W.2d at 443. Although petitioner takes issue with this conclusion, his argument is based on his reading of the CSPA, under which the prosecution does not bear the burden of showing that he remains a danger to others if released. As noted in connection with petitioner's due process challenge, the court of appeals did not interpret the CSPA in this fashion, and this Court is bound by the limiting construction given the statute by the state court.

R&R dated 3/7/01, at 20-21.

Second, and more fundamentally, I concluded that "petitioner's equal protection claim fails for a more fundamental reasons: he cannot show that he is similarly situated to persons committed under the Mental Health Code." *Id.* at 21. As I explained:

> The Equal Protection Clause of the Fourteenth Amendment is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, "the Equal Protection Clause does not 'demand that a statute necessarily apply equally to all persons' or require 'things which are different in fact . . . to be treated in law as though they were the same.'" *Michael M. v. Superior Ct. of Sonoma County*, 450 U.S. 464, 469 (1981) (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 309 (1966)) (alteration in original). The Equal Protection Clause thus "does not take from the States all power of classification." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 271 (1979); *accord Reed v. Reed*, 404 U.S. 71, 77 (1971).
>
> Thus, where a state classifies persons so that they are not similarly situated in constitutional respects, the inquiry becomes whether the state's classification is itself proper. In the ordinary case, "[t]he general rule is that legislation is presumed valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. However, if the statute classifies on a "suspect" basis (*i.e.*, race, alienage, or national origin) or impinges upon fundamental rights secured by the Constitution, the classification is subject to strict scrutiny. Under this standard, the state's classification will be upheld only if narrowly tailored to serve a compelling governmental interest. *See Cleburne*, 473 U.S. at 440; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983).
>
> To the extent petitioner claims that he is being treated differently from all civil committees confined under the Mental Health Code, his claim fails because he, as a recidivist sex offender, is not similarly situated to other types of civil committees. The legislature could rationally conclude that the compelling interest of protection against sex offenders would be best served by a strong civil

15

commitment statute.  As Justice Breyer observed in *Hendricks*, "[t]he Constitution does not require [a state] to write all of its civil commitment rules in a single statute or forbid it to write two separate statutes each covering somewhat different classes of committable individuals." *Hendricks*, 521 U.S. at 377 (Breyer, J., concurring in part and dissenting in part).  Here, the difference in treatment is justified by "[t]he particularly devastating effects of sexual crimes on victims, and the offenders' need for specialized treatment[.]" *In re Morrow*, 616 N.W.2d 544, 549 (Iowa 2000).  Thus, every court to have considered similar statutory schemes has rejected equal protection challenges like those made by petitioner.  *See Bailey v. Gardebring*, 940 F.2d 1150, 1153 (8th Cir. 1991); *Martin*, 987 P.2d at 798; *Westerhide v. State*, 767 So. 2d 637, 655 (Fla. Ct. App. 2000); *In re Detention of Samuelson*, 727 N.E.2d 228, 237 (Ill. 2000); *Morrow*, 616 N.W.2d at 548-49; *In re Hay*, 953 P.2d 666, 675 (Kan. 1998); *In re Blodgett*, 510 N.W.2d 910, 917 (Minn. 1994); *State v. Post*, 541 N.W.2d 115, 130 (Wis. 1995); *cf. Minnesota ex rel. Pearson v. Probate Ct.*, 309 U.S. 270, 275 (1940) ("[T]he legislature is free to recognize degrees of harm, and it may confine restrictions to those classes of cases where the need is deemed to be clearest.").  In short, the CSPA "serves a compelling state interest–protection of the public.  In addition, the statute is narrowly drawn to encompass only those individuals who, because of a "mental abnormality" are predisposed to sexually violent behavior.  Therefore, [the CSPA] does not violate [petitioner's] right to the equal protection of the law[.]" *In re Detention of Garren*, 620 N.W.2d 275, 286 (Iowa 2000).

Petitioner likewise cannot show that he is similarly situated only to sex offenders like himself who are incarcerated under the provisions of the Mental Health Code.  The simple fact is, at the time petitioner was committed the CSPA had yet to be repealed, whereas it had been by the time that others such as he were committed under the provisions of the Mental Health Code.  Improvement in the criminal justice, sentencing, and mental health schemes of a state are substantial governmental interests, and a state does not violate equal protection by applying different schemes to persons who committed their crimes at different times.  *Cf. Alvarez v. Straub*, 64 F. Supp. 2d 686, 698-99 (E.D. Mich. 1999) (Rosen, J., adopting Report and Recommendation of Komives, M.J.) (discussing cases involving different sentencing schemes).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his equal protection claim.

*Id*. at 21-24 (footnoted omitted).

In his objections filed in connection with his Rule 60(b) motion, petitioner objects to my conclusion that his equal protection claim is without merit.  With respect to my first basis for rejecting his claim, he contends that there are constitutionally significant differences between the release procedures of the CSPA and the MHC.  With respect to the second basis for rejecting his

16

claim, petitioner contends that (a) he is similarly situated to detainees under the Mental Health Code and (b) I erred in applying rational basis review rather than strict scrutiny to the difference in treatment.  Because it fully resolves petitioner's equal protection claim, I address only the second basis upon which my previous conclusion rested.

As the foregoing quotation from my previous Report demonstrates, I there concluded that petitioner was not similarly situated to either (a) general civil detainees under the MHC or (b) sex offenders detained under the MHC.  With respect to the former, I concluded that the state had a compelling interest in treating differently these two classes of detainees.  Petitioner does not take issue with this conclusion in either his initial or supplemental objections.  Rather, petitioner contends that I erred in concluding that Michigan's interest in improving its criminal justice and mental health schemes justified its different treatment of petitioner and persons detained under the MHC after having been found not guilty by reason of insanity.

In neither his initial nor supplemental objections does petitioner offer any basis to reject my conclusion that improvement in a state's criminal justice and mental health schemes constitutes a legitimate governmental interest justifying differing treatment of those incarcerated or detained prior to the statutory improvements and those incarcerated or detained after such improvements.  Even if he were to make this argument, the courts that have considered the matter have held universally to the contrary.  *See Alvarez v. Straub*, 64 F. Supp. 2d 686, 698-99 (E.D. Mich. 1999) (Rosen, J., adopting Report and Recommendation of Komives, M.J.) (discussing *McQueary v. Blodgett*, 924 F.2d 829, 834 (9th Cir. 1991); *McLean v. State*, 787 S.W.2d 196, 198 (Tex. Ct. App. 1990); *People v. Nowak*, 55 N.E.2d 63, 65 (Ill. 1944)); *see also*, *State v. Standifer*, 946 P.2d 637, 639-40 (Kan. Ct. App. 1997); *People v. Montoya*, 647 P.2d 1203, 1206 (Colo. 1982).  *See generally*, *Sperry &*

*Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911) ("[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the rights of an earlier and later time.").

Petitioner's argument instead focuses on my use of the rational basis test. Relying on the Supreme Court's decision in *Foucha v. Louisiana*, 504 U.S. 71 (1992), petitioner contends that an analysis of this issue requires the application of the strict scrutiny test, under which the difference in treatment must be narrowly tailored to serve a compelling state interest. The Sixth Circuit also suggested that *Foucha* requires the application of strict scrutiny to the state's difference in treatment between petitioner and MHC detainees. *See Williams*, 346 F.3d at 616. Nothing in *Foucha*, however, compels the application of strict scrutiny to the state's classification.

In *Foucha*, the Court held that it violated an insanity acquittee's due process rights to incarcerate him after he was no longer suffering from any mental impairment. *See Foucha*, 504 U.S. at 75-83. In an opinion which did not garner a majority, Justice White also concluded that the continued detention violated the detainee's equal protection rights. *See id*. at 84-86 (plurality op.). Although Justice White did not explicitly apply the strict scrutiny test, he did invoke strict scrutiny type language, reasoning that "[f]reedom from physical restraint being a fundamental right, the State must have a particularly convincing reason . . . for such discrimination against insanity acquittees who are no longer mentally ill." *Id*. at 86 (plurality op.).

*Foucha* provides scant support for the application of strict scrutiny here, for several reasons. First, *Foucha* is distinguishable in important respects. Notably, the Louisiana statute at issue in *Foucha* permitted the state to indefinitely detain an insanity acquittee even though he was no longer suffering from any mental illness. Under the state's view, it was permitted to detain Foucha, who

18

was not then insane, merely "because he at one time committed a criminal act and does not now prove that he is not dangerous." *Foucha*, 504 U.S. at 85 (plurality op.).  In other words, the state sought to detain Foucha solely because of his future dangerousness, without an accompanying finding of a mental impairment, an action which clearly violated Foucha's due process rights.  *See Hendricks*, 521 U.S. at 358 (noting that dangerousness alone is not "a sufficient ground upon which to justify indefinite involuntary commitment," and that civil commitment statutes are constitutional only when they "couple[] proof of dangerousness with proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'"); *Foucha*, 504 U.S. at 78-81.  The plurality found an equal protection violation because the statute "does not provide for similar confinement for other classes of persons who have committed criminal acts and who cannot later prove they would not be dangerous."  *Foucha*, 504 U.S. at 85 (plurality op.).

Thus, even if *Foucha* resolved the standard of review issue, it would not be applicable here. *Foucha* discusses only the standards applicable to "insanity acquittees who have regained their mental health. . . .  The case says nothing about the treatment of an acquittee who remains mentally ill throughout but ceases for a period of time to be dangerous."  *Francis S. v. Stone*, 995 F. Supp. 368, 383 (S.D.N.Y. 1998).  Indeed, the fact that Foucha was no longer mentally ill was integral to the Court's decision on the due process issue and to the plurality's reasoning on the equal protection issue.  *See Hartman v. Summers*, 878 F. Supp. 1335, 1345-46 (C.D. Cal. 1995).  Here, unlike in *Foucha*, it is not conceded that petitioner no longer suffers from a mental illness or abnormality rendering him subject to involuntary commitment.  On the contrary, each of the four doctors who testified at petitioner's release hearing testified that petitioner continues to suffer from a mental

disorder,[2] and petitioner's amended habeas application focuses almost exclusively on the finding of future dangerousness. Thus, even if Justice White's opinion established a clear rule of law that strict scrutiny applied to statutes like those at issue in *Foucha*, it would have little applicability here.[3]

More fundamentally, Justice White's plurality opinion establishes no binding precedent which this Court must apply. Justice White's opinion on the equal protection issue was joined by only three other Justices, and thus did not garner a majority of the Court. The remaining justices did not address the equal protection argument at all. It is well established that a plurality opinion discussing a principle of law which does not attract the support of a majority of the Justices does not establish binding precedent. *See Texas v. Brown*, 460 U.S. 730, 737 (1983); *Hertz v. Woodman*, 218 U.S. 205, 213-14 (1910). Faced with such a decision, this Court's obligation is to apply, to the extent available, binding rules from other Supreme Court cases and the binding decisions of the court of appeals. *See Myrick v. Freuhaut Corp.*, 13 F.3d 1516, 1523 (11th Cir. 1994).[4]   Supreme

---

[2]Some of the psychiatrists did testify that petitioner's mental disorder does not constitute a "mental illness" under Michigan law. This testimony does not, however, call into question the state's power to continue petitioner's commitment. *See Hendricks*, 521 U.S. at 358-59 (noting that commitment is permissible when finding of dangerousness is coupled with "a 'mental illness' or 'mental abnormality,'" and that "the term 'mental illness' is devoid of any talismanic significance.").

[3]Essentially, petitioner's equal protection claim and his due process claim merge to a large extent. *See Jones v. United States*, 463 U.S. 354, 362 n.10 (1983).

[4]In *Marks v. United States*, 430 U.S. 188 (1977), the Court explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Id.* at 193 (internal quotation omitted). Here, however, there is no "narrowest ground" on which a majority of Justices agreed, because a majority simply did not consider the equal protection issue. "When it is not possible to discover a single standard that legitimately constitutes the narrowest grounds for a decision on that issue, there is no law of the land because no standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003). Thus, the *Marks* rule is inapplicable here.

Court precedent extant at the time of *Foucha*, which neither *Foucha* nor any subsequent case has called into doubt, compels the application of rational basis review notwithstanding Justice White's plurality opinion. Importantly, petitioner does not complain about the difference between his treatment and that of non-detained persons; rather he complains about the difference between his treatment and that of other detainees. Addressing other such differences in treatment, either in the context of due process or equal protection challenges, the Supreme Court has consistently applied rational basis review.

In *Baxtrom v. Herold*, 383 U.S. 107 (1966), the Court found an equal protection violation in a New York statutory procedure "under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York." *Id*. at 110. In reaching this conclusion, however, the Court applied language which the courts now associate with rational-basis review. The court reasoned that, once the state had provided jury review to civil detainees in general, it could not "*arbitrarily* withhold it from some." *Id*. at 111 (emphasis added). The Court also explained that while equal protection does not require all persons to be treated the same, it "does require that a distinction have *some relevance* to the purpose for which the classification is made." *Id*. (emphasis added). Applying this standard, the Court concluded that "there is no *conceivable basis* for distinguishing the commitment of a person who is nearing the end of a penal term from all other civil commitments." *Id*. at 111-12 (emphasis added). The Court also noted that the classifications drawn by the statute were "capricious[]" and lacked "all semblance of rationality." *Id*. at 115.

In *Jackson v. Indiana*, 406 U.S. 715 (1972), the Court considered a due process challenge to a state statute which permitted the indefinite commitment of a criminal defendant solely on the

basis of his incompetency to stand trial.  The Court struck down the statute, but again did so in language suggestive of rational-basis review, noting that "due process requires that the nature and duration of commitment bear some *reasonable relation* to the purpose for which the individual is committed," *id*. at 738 (emphasis added), and concluding that the Indiana statute failed to pass this test.  In *Jones v. United States*, 463 U.S. 354 (1983), the Court upheld a statute permitting a person committed to a mental hospital following an insanity acquittal to be held beyond the term of imprisonment he might have served had he been convicted.  Relying on the *Jackson* Court's language regarding a reasonable relationship between the nature and purpose of the confinement, the Court upheld the statute against a due process challenge.  *See id*. at 368-69.  Further, the Court noted that "'when Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Id*. at 370.

These cases all support the conclusion that distinctions between one class of civil detainees and another class of detainees are subject only to rational basis review.  *See United States v. Budz*, 361 F. Supp. 2d 762, 769-70 (N.D. Ill. 2005) (applying rational basis review to state statutes providing separate procedures for "sexually violent persons" and "sexually dangerous persons"); *Westerheide v. State*, 831 So. 2d 93, 111-12 (Fla. 2002) (citing cases from various state courts).  The fact that some of these case were decided under the Due Process Clause rather than the Equal Protection Clause does not alter this conclusion.  "Regardless of whether a court is employing substantive due process or equal protection analysis, it should use the same standards of review." RONALD D. NOVAK & JOHN E. YOUNG, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE & PROCEDURE § 15.4 (3d ed. 1999); *see also*, *Montalro-Huertas v. Rivera-Cruz*, 885 F.2d 971, 976

n.7 (1st Cir. 1989); *Prieto v. Metropolitan Dade County*, 718 F. Supp. 934, 936 (S.D. Fla. 1989).[5]

As noted above, petitioner does not challenge in either his initial or supplemental objections my application of the rational-basis test, and for the reasons discussed in my initial Report the state's allegedly different treatment of petitioner from persons now confined under the Mental Health Code, which was not in effect at time of petitioner's detention, is rationally related to a legitimate governmental interest. Because petitioner's argument that strict scrutiny should apply is without merit, the Court should overrule his objections on these grounds.

C.      *Conclusion*

In view of the foregoing, the Court should overrule petitioner's objections to my initial Report & Recommendation. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.      NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health*

---

[5]Of course, this identity between standards of review applies only when the challenge to the statute is based on an asserted fundamental right. When a statute has the effect of discriminating against a protected class under the Equal Protection Clause, heightened scrutiny may apply to the equal protection challenge even though the due process analysis proceeds under rational basis review, because an otherwise valid statute may not discriminate against such protected classes. *Cf. DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989). This distinction is inapplicable here, however, as the Supreme Court has held that the mentally ill do not constitute a suspect or quasi-suspect class triggering heightened scrutiny under the Equal Protection Clause. *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (1985); *cf. Board of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 366-67 (2001).

23

*& Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 8/10/2005

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on August 10, 2005.
>
> s/Eddrey Butts
> Case Manager

24